UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS

U.S. DISTRICT COURT
No.

LEON GELFAND,
   Plaintiff,

vs.

BORIS SORKIN, DAVID GOLDIN, YELENA
GOLDIN, HENRY B. WYNN, and ATLANTIC
FISH MARKET, INC.,
   Defendants

03 12571 PBS

## COMPLAINT

### PARTIES

1. Leon Gelfand ("Gelfand") is a natural person residing at 143 Jacques street Somerville, Middlesex County, Massachusetts.

2. Boris Sorkin ("Sorkin") is an individual residing at 75 Valentine Street, Newton Middlesex County, Massachusetts.

3. David Goldin ("Goldin") is an individual residing at 14 Beecher Terrace, Newton, Middlesex County, Massachusetts.

4. Yelena Goldin ("Ms. Goldin") is an individual residing at 14 Beecher Terrace, Newton, Middlesex County, Massachusetts.

5. Henry B. Wynn ("Wynn") is an individual residing at 33 Pond Avenue, Brookline, Norfolk County, Massachusetts.

6. Atlantic Fish Market, Inc. ("Atlantic Fish") is a Massachusetts corporation with a usual place of business at 270 Parson Street, Brighton, Suffolk County, Massachusetts.

7. Sorkin, Goldin and Gelfand are the sole shareholders of Atlantic Fish. Sorkin is president of the company and Goldin is vice president.

8. David Goldin and Yelena Goldin (collectively "the Goldins") were friends of Gelfand's family.

9. In December 2001, the Goldins approached Gelfand and told Gelfand that Goldin was in the fish business with Sorkin, that the business was doing very well, and that they had invested $250,000.00 in the business, but that it needed an additional $100,000.00 to purchase more product.

10. The Goldins then asked Gelfand if he would lend the Goldins the necessary funds, and Gelfand agreed, so long as Goldins executed a promissory note.

11. Pursuant to the Promissory Note, the loan to the Goldins was to have been paid back to Gelfand by January 16, 2002, but no payments were ever made.

12. Just prior to giving the money to the Goldins, Goldin asked Gelfand to make the check for $100,000.00 payable to Atlantic Fish. When Gelfand asked why should the check be made payable in this manner, Goldin explained that Atlantic Fish was under a deadline to purchase the products, and that if the funds had to go through Goldins' account, the company might miss the deadline.

13. Since the Goldins were personally liable on the promissory note and had agreed that the note would reflect this, even though the funds were being paid to Atlantic Fish, Gelfand complied and made the check for $100,000.00 payable to Atlantic Fish.

14. In early January 2002, Goldin had learned through his personal relationship with Gelfand that Gelfand had recently acquired significant funds from the sale of real estate. Goldin asked Gelfand if Gelfand would be interested in investing in Atlantic Fish.

Goldin represented that Atlantic Fish had great potential, as it was going to expand its market by opening an overseas processing plant.

15. Based upon the representations of Goldin, Gelfand stated he might be interested in learning about Atlantic Fish and its future plans.

16. The Goldins set up a meeting with Gelfand and Sorkin at Atlantic Fish's offices to discuss Gelfand making any investment in the company.

17. Gelfand, Sorkin and Goldin met a few days later, and during that meeting, Sorkin represented to Gelfand that Sorkin had been in the fish business for over twelve years, that Sorkin 'knew everything there is to know about the fish business, and everyone in the business,' and that Atlantic Fish was poised to become a dominant player in the fish wholesale business; the only thing holding Atlantic Fish back, Sorkin told Gelfand, was that it needed additional funding to purchase a warehouse that was to be converted to a processing plant it had identified in Tallinn, Estonia.

18. During this meeting, Sorkin told Gelfand that as part of its efforts to expand its market, Atlantic Fish had just signed a joint venture with an Estonian company called Watkins that was located in Tallinn, Estonia.

19. Sorkin told Gelfand that two companies (Atlantic Fish and Watkins) were going to be equal partners in a venture to be known as Atlas Seafood ("Atlas"), and this venture's goal, Sorkin said, was to build the "biggest and the best" fish processing plant in Europe.

20. Sorkin said that he already had several European companies that were eager to purchase product from Atlas.

21. Sorkin also represented that Atlas had signed a contract with suppliers to provide fish from Russia, and that Atlantic Fish signed a purchase and sale agreement in the amount of $630,000.00 (U.S.) for the purchase by that company of a warehouse and land where the plant is to be built. The only thing that the company was waiting for, Sorkin said, was the down payment of $130,000.00, as the remainder of the purchase price was going to be financed by the seller.

22. Shortly after the meeting, Goldin told Gelfand that Sorkin's claims were indeed true, that he (Goldin) had been in Tallinn, Estonia during the find of the real estate and later Sorkin had shown Goldin the purchase and sale agreement for the realty, the joint venture agreement with Watkins, and the requests from the European companies for product from the plant when completed.

23. In an effort to induce Gelfand, Goldin also stated that if Gelfand decided to join the company and later wanted to get out, Goldin would personally reimburse all the money that Gelfand invested.

24. Gelfand relied upon Goldin's promises to reimburse him, and upon Sorkin's representations that Sorkin was highly knowledgeable about the fish industry.

25. Sorkin and Goldin invited Gelfand to Estonia, where Sorkin told Gelfand he would introduce Gelfand to a local businessman and joint venture partner, Alexie Felipiev, who owned a fish wholesale business known as Watkins.

26. Sorkin told Gelfand that through Felipiev's local contacts in Tallinn, Estonia he could present prerequisite venture help Atlantic Fish get the processing plant up and running.

27. In exchange, Atlantic Fish and Watkins formed a joint venture called Atlas Seafood, and under this joint venture, the parties would each share the costs of completing the processing plant equally.

28. Sorkin, on several occasions, assured Gelfand that Atlantic Fish, and not any other person or entity, would own the real estate in which the plant will be situated.

29. Sorkin also represented that all of the agreements necessary for the joint venture with Watkins were in place and signed by all of the parties, and all that the parties were waiting for was Atlantic Fish to purchase the Tallinn, Estonia realty.

30. Gelfand asked to see the joint venture agreement, Sorkin told him that it was not available, as it was with Sorkin's attorney in Tallinn, Estonia.

31. Sorkin promised that he would provide a copy to Gelfand at some point. Sorkin told Gelfand that if Gelfand did not believe the agreement existed, Gelfand should speak with Goldin, who had seen the agreement.

32. Gelfand did speak directly with Goldin who assured Gelfand that all the necessary joint venture and other agreements were in place and that he had personally seen and read them.

33. Sorkin also represented to Gelfand that an agreement was already signed by Atlantic Fish for the purchase of the realty, but that Atlantic Fish needed to obtain the requisite $130,000.00 down payment. Sorkin then asked Gelfand if he would be interested in investing at least that amount in Atlantic Fish so that Atlantic Fish could secure the purchase of the premises.

34. Gelfand stated that he would, so long as Atlantic Fish in fact purchased the realty, as Gelfand was concerned that the corporation had no other tangible assets.

35.   In an effort to induce Gelfand to invest more than the $130,000.00 necessary as the down payment for the Tallinn realty, Sorkin promised Gelfand that if Gelfand invested a total of $250,000.00 in Atlantic Fish, Gelfand would receive a ten percent (10%) ownership in Atlantic Fish and twenty percent (20%) of all the dividends including real estate and the plant if it ever to be sold in the future. Sorkin further told Gelfand that he would be "working partner and not just an investor."

36.   Gelfand visited Tallinn in mid-January 2002, Sorkin showed Gelfand around the plant that Sorkin stated that Atlantic Fish would be the owner of the realty. Sorkin represented to Gelfand that it was Atlantic Fish's goal through its venture to have the "most modern processing plant" around, and that when completed, it would be state-of-the-art.

37.   While touring the Tallinn plant, it became clear to Gelfand that the $250,000.00 he was being asked to invest in Atlantic Fish specifically for the purpose of helping it construct the plant would not be enough to finish the plant. When Gelfand pointed this out to Sorkin and Goldin and asked them how they were planning to raise the rest of the money for construction, Sorkin stated that he and Goldin had $400,000 worth of canned fish product in the warehouse and they were in negotiations with some companies to sell it, which would result in the necessary funds. Goldin also added that he and his wife had large sums of money in Switzerland, and if necessary, they were willing to use the funds to complete the plant.

38.   Gelfand returned to Boston, and a few days later Sorkin and Goldin called Gelfand from Tallinn to inquire if Gelfand would be interested in investing in Atlantic Fish. Gelfand was still unsure if he wanted to invest in the company, so as a further

inducement to Gelfand, Sorkin told Gelfand that if paying $250,000.00 would be difficult at that time, Sorkin would agree that the $100,000.00 Gelfand lent to the Goldins could be applied towards that amount. Gelfand agreed to this, but only if the Goldins agreed to remain personally liable for repayment of the $100,000.00 if the investment in Atlantic Fish failed for any reason. All parties agreed to this, and the Goldins represented to Gelfand that he could retain the promissory note as guarantee of their promise to repay him.

39. Based upon the promises made by Sorkin and the Goldins, and based upon the representations made by Sorkin about his plans for Atlantic Fish and the Tallinn realty, Gelfand stated would be interested in investing in Atlantic Fish. Sorkin suggested that Gelfand contact Wynn, whom Sorkin identified as the corporate attorney for Atlantic Fish; Wynn, he told Gelfand, would prepare all the necessary legal documents for Gelfand's investment, including a stock sale agreement.

40. Gelfand contacted Wynn as instructed, who stated to Gelfand that he was corporate counsel and that he would prepare the necessary documents, including the stock sale agreement, and forward them to either Gelfand or Gelfand's counsel. In all of his dealings with Gelfand, Wynn represented himself as legal counsel for Atlantic Fish, and Sorkin confirmed this on numerous occasions.

41. Wynn, who was admitted to the Massachusetts Bar on May 9, 1967, had his law license suspended on March 18, 1988, and again on July 14, 1989.

42. Wynn's law license, as of this date, and at all times relevant to this action, continues to be suspended.

43. Wynn has sent correspondence related to this matter using letterhead titled "Henry B. Wynn & Associates."

44. Just prior to making the payments to Atlantic Fish, Sorkin called Gelfand and asked that Gelfand provide Atlantic Fish with $20,000.00, and make the other $130,000.00 investment payable to a company called Front Holding through bank wire. When queried on this by Gelfand, Sorkin stated that Front Holding was the company selling the Tallinn realty, and because Atlantic Fish was late in making the deposit on that realty, it would be quicker to just have Gelfand pay the deposit amount directly to Front Holding, instead of waiting for Gelfand's funds to clear through Atlantic Fish's account. Based upon this representation by Sorkin, which was also confirmed by Wynn and Goldin, Gelfand did as Sorkin suggested.

45. Gelfand was concerned with making the payment directly to Front Holding as suggested by Sorkin, so Gelfand required that the stock purchase agreement provide that "in the event a certain real estate transaction does not occur by March 1, 2002 whereby the Company is to purchase" the Tallinn facility, "the Company agrees that all monies tendered by [Gelfand] in the amount of one hundred and fifty thousand ($150,000.00) dollars shall be fully refunded to the Buyer." Sorkin signed this agreement his both his corporate and individual capacity.

46. The stock sale agreement also referenced numerous documents and financial statements that were provided to Gelfand. When Gelfand met with Wynn on January 29, 2002 to sign the stock sale agreement, Gelfand pointed out to Wynn that the documents had not in fact been presented to Gelfand, both Wynn and Sorkin (by telephone from Tallinn) told Gelfand that the documents and financial statements would be provided

"any time you request them", but that Wynn did not have them at that time, as the documents were in Tallinn with Sorkin. When Gelfand protested and stated that he wanted to see the documents prior to signing the stock sale agreement, both Wynn and Sorkin stated that if there were any further delays, the company would lose the Tallinn real estate deal. Sorkin promised Gelfand the documents and financial statements would be provided upon his return from Tallinn, and based upon this representation, Gelfand signed the agreement.

47. In April 2002, Gelfand sold some real estate and as a result, had additional funds. When Sorkin and Goldin learned of this, they asked Gelfand to meet them at Atlantic Fish's Boston office. At that meeting, they asked Gelfand if he would be interested in lending Goldin, and Sorkin $250,000. When Gelfand expressed skepticism, and asked for a reason both Sorkin and Goldin told Gelfand that if they did not raise additional funds the company stood a "good chance" of losing the Tallinn realty, as it was late on mortgage payments, and further needed the funds to continue with the construction.

48. When Gelfand stated that he could not understand how this could be, Sorkin told him that, based upon his "years of experience in the fish business," it takes a long time to get a processing plant like the one they were building in Tallinn up and running, and a lot of initial capital was necessary. In addition, Sorkin and Goldin told Gelfand that with their lack of experience in building processing plants, there were a lot of changes during the beginning stages of construction, and a lot of money was wasted. Gelfand then asked Sorkin and Goldin about the funds they promised to contribute; Sorkin replied that the canned goods, which he earlier represented as being worth $400,000 were not

selling and did not know if they ever would sell, and Goldin replied that his money in Switzerland was in a special interest bearing account and could not be touched.

49. Sorkin told Gelfand that if additional funds were not raised, there was a strong likelihood Gelfand would lose his initial investment of $250,000.00. Fearful of this, Gelfand stated that he would invest additional funds under the same conditions as in the previous agreement by acquiring more shares of stock in Atlantic Fish and an additional percentage of the profits, and further, that he wanted to see the agreement reflecting this before the funds would be given to Sorkin and Goldin.

50. Sorkin stated that he could not give Gelfand any more of his stock in Atlantic Fish, as Sorkin would then "have nothing left of [his] company." Instead, Sorkin suggested that Gelfand invest an additional $250,000.00 in Watkins, which in turn would be used to continue the construction and pay mortgage on the Tallinn plant. Sorkin stated to Gelfand that since Atlantic Fish and Watkins were "fifty-fifty" partners, the outcome would be the same for Gelfand.

51. Gelfand stated he would agree to this only upon the condition that any dividends and proceeds due from Watkins would be legally paid through Atlantic Fish. Sorkin agreed to this, as did Felipiev, both in the presence of Goldin. Gelfand then asked that Sorkin have Wynn, as corporate counsel for Atlantic Fish, forward the necessary agreement to Gelfand reflecting this. Sorkin stated that he would have Wynn do it "immediately."

52. A few days later, Sorkin and Goldin spoke with Gelfand and stated that they needed the additional funds Gelfand was going to invest in Atlantic Fish through Watkins. As Sorkin and Goldin explained to Gelfand, they had received a letter of default from seller

stating that if payment were not received within one week, the real estate would be foreclosed, as they were already overdue. When Gelfand protested that he still had not received the necessary documents from Wynn, Sorkin and Goldin explained that Wynn was working on the documents and should have them shortly, but in the interim, the Tallinn plant was in jeopardy of being lost due to the lack of funds. Both Sorkin and Goldin promised Gelfand that the necessary agreements would be forthcoming from Wynn, and further that "as men of our word," they would honor their agreement with Gelfand.

53.     Based upon these representations by Sorkin and Goldin, Gelfand provided them with an additional $250,000.00, but when he stated that he would make the check payable to either Sorkin or Atlantic Fish, Sorkin insisted that $200,000.00 of the funds be paid directly to Watkins, that $30,000.00 of the funds be paid directly to Atlas, and that the remaining $20,000.00 be paid to an electrical contractor. When Gelfand questioned why the funds should be paid in this manner, and in particular directly to Watkins, Sorkin said it was "to keep the records straight."

54.     About a month later, Sorkin asked that Gelfand meet him and Goldin at Atlantic Fish's office. At the meeting, Sorkin stated that "on the recommendation of my accountant and Wynn," the terms of the stock sale agreement had to be changed. The basis, Sorkin said, was that since he personally sold his shares of the company, he would have to pay capital gains on $500,000.00, ($250,000 from Gelfand and $250,000 from Goldin) but there was "no way on earth I will pay that amount to the government." Even though Sorkin had in fact sold his own shares of stock and was asking the parties to state differently in the agreement, Goldin agreed right away to modify the agreement, but

Gelfand stated that he would not change the contract, as he was fearful that this would be tantamount to tax fraud.

55.   Shortly thereafter, Gelfand asked Sorkin to meet him in the Atlantic Fish's office to discuss his investment and why no information had been given to Gelfand in a long time, despite his requests. Gelfand also asked Sorkin why neither he, Wynn nor Goldin had not provided any of the documents as allowed by the stock sale agreement. Sorkin told Gelfand that if Gelfand did not agree to sign the new agreement that would allow Sorkin to avoid paying capital gains taxes, then Sorkin would make sure that Gelfand never got any of the information on his investment or documents he requested.

56.   When Gelfand told Sorkin that he would never sign the new agreement because he considered it to be tax fraud, Sorkin became enraged and told Gelfand that Sorkin would overcome the issue by substituting the signature page of the new agreement with the one originally signed by Gelfand and there was "nothing he can do about it." Gelfand told Sorkin that he would never get away with it because the original agreement was signed via fax while Sorkin was in Tallinn. By matching date on the agreement and the date on the fax could only show that signed documents via fax are the only original documents. Sorkin replied that he did not care and he was going to alter the agreement anyway to avoid the taxation issue.

57.   After Gelfand refused to sign the fraudulent tax avoiding documents, Sorkin told Gelfand, "as for the documents, you'll have no use for them anyway, since everything now belongs to Atlas, and I own Atlas." When pushed on this by Gelfand, Sorkin stated that he is the sole shareholder of Atlas, and that there never was any binding written

agreement between Atlantic Fish and Watkins, and as a result, Sorkin now owned everything; Sorkin then told Gelfand "to get the hell out of this office."

58. Immediately upon being thrown out of the office by Sorkin, Gelfand called Goldin and explained what had happened; Goldin did not seem surprised. Goldin told Gelfand that he would "look into it" and get right back to Gelfand; Goldin never did.

59. Shortly thereafter, Gelfand met Goldin to demand his investment back, and reminded Goldin that he personally guaranteed that he would return Gelfand's money if there was a breach of any of the agreements by Goldin, Sorkin or Atlantic Fish. Goldin replied that he did not have any money and that Gelfand should "just leave [him] the hell alone."

60. Gelfand has made numerous demands upon Sorkin, Wynn and the company that they provide the documents and financial statements referenced in the stock sale agreement. To date, no documents have been provided, and Sorkin, Wynn and the company have stated that they will not provide any documents, other than essentially corporate meeting minutes.

61. Gelfand has also recently learned that Wynn's license to practice law has been, and remains, suspended.

62. Gelfand has also recently learned that Front Holding owns the Tallinn realty and not the seller of realty, and that Front Holding and Atlas both are now actually owned solely by Sorkin, and Sorkin has consolidated the two companies by selling Front Holding to Atlas. Moreover, Front Holding purchased the building from a third party, using the funds provided by Gelfand.

63. Gelfand also recently learned that Atlas Fish is controlled solely by Sorkin and that Felipiev and/or Watkins are not, nor were ever, involved in any joint venture with Atlantic Fish.

64. Gelfand has made numerous demands upon Sorkin, Wynn and the company that they provide the agreement reflecting the deal whereby Gelfand invested an additional $250,000.00 in Atlantic Fish through Watkins, but Sorkin, Wynn and the company have stated that they will not provide any such agreement.

## COUNT I – CIVIL RICO vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN AND HENRY B. WYNN

65. Gelfand realleges and incorporates by reference Paragraphs 1 through 64 as if specifically set forth herein.

66. Sorkin, Goldin, Ms. Goldin and Wynn have conducted the affairs of the enterprise known as Atlantic Fish, Inc., through a pattern of racketeering, in foreign commerce, intending to cause economic harm to Gelfand.

67. The Defendants named in Count I did in fact cause economic harm in the amount of $500,000 to Gelfand.

68. As a direct result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, Gelfand has suffered damages as hereinbefore alleged, incurred attorney's fees and costs.

## COUNT II ~ ACCOUNTING vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

69. Gelfand re-alleges and incorporates by reference Paragraphs 1 through 68 as if specifically set forth herein.

70. Gelfand is entitled to a complete accounting of all of the monies advanced by him to the Defendants. Such accounting should include all business records, including bank statements, checkbooks, canceled checks, ledgers, invoices, receipts, tax returns, withdrawals or any other documentation that refers or relates to the monies advanced by him to any of the Defendants.

## COUNT III ~ BREACH OF CONTRACT vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

71. Gelfand re-alleges and incorporates by reference Paragraphs 1 through 70 as if specifically set forth herein.

72. Gelfand performed all conditions in the agreement required on his part to be performed. The Defendants have failed to comply with the agreement by opening and operating the intended business and by instead using Gelfand's funds for the Defendants' own benefit.

73. As a result of the Defendants' breach of the agreement, Gelfand suffered damages and continues to suffer damages hereinbefore alleged.

## COUNT IV ~ CONVERSION vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

74. Gelfand re-alleges and incorporates by reference Paragraph 1 through 73 as if specifically set forth herein.

75. The Defendants, by refusing to give Gelfand the shares of stock in Atlantic Fish and/or the value thereof, have exercised dominion and control over property that rightfully belongs to Gelfand.

76. The Defendant's exercise of dominion and control over the aforementioned property is wrongful and seriously impairs and interferes with Gelfand's rightful possession of same.

77. As a result of the Defendant's wrongful exercise of dominion and control over this property, Gelfand has and continues to suffer damages as hereinbefore alleged.

## COUNT V ~ UNJUST ENRICHMENT vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

78. Gelfand re-alleges and incorporates by reference Paragraph 1 through 77 as if specifically set forth herein.

79. The Defendants, by breaching the agreement and by refusing to pay over the funds due Gelfand, have and continue to be unjustly enriched to the detriment of Gelfand.

## COUNT VI ~ MISREPRESENTATION vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

80. Gelfand re-alleges and incorporates by reference Paragraph 1 through 79 as if specifically set forth herein.

81. The Defendants made the representations to Gelfand that the funds Gelfand advanced in good faith would be used solely and explicitly for operating Atlantic Fish and its processing plant.

82. The Defendants made these material misrepresentations to induce Gelfand to forward the $500,000.00 to the Defendants, purportedly for the benefit of Atlantic Fish.

83. The misrepresentations made by the Defendants were made with the intention that Gelfand rely upon them, and Gelfand did in fact rely upon the said misrepresentations in forwarding the funds to the Defendants.

84. Gelfand would not have forwarded any funds had those misrepresentations not been made.

85. As a result of the foregoing misrepresentations, and Gelfand's reliance thereon, the Defendants are liable to Gelfand.

## COUNT VII ~ BREACH OF FIDUCIARY DUTY vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

86. Gelfand re-alleges and incorporates by reference Paragraph 1 through 85 as if specifically set forth herein.

87. As a partner with Gelfand, the Defendants owed a fiduciary duty as to the funds forwarded by Gelfand purportedly on Atlantic Fish's behalf.

88. The Defendants breached this duty by commingling and/or misappropriating the funds from Gelfand and by failing to account for the expenditure of the funds.

89. The Defendants continued to knowingly breach this duty by failing to provide an accounting and by using the funds for purposes other than those purposes original stated to Gelfand.

## COUNT VIII ~ CONSTRUCTIVE TRUSTS vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

90. Gelfand re-alleges and incorporates by reference Paragraph 1 through 89 as if specifically set forth herein.

91. The Defendants wrongfully obtained control over the funds given in good faith by Gelfand by the misrepresentations made to Gelfand.

92. A constructive trust should be imposed on all funds or real property up to the amount $500,000.00 currently held by Sorkin, Wynn, the Goldins, and Atlantic Fish for the benefit of Gelfand.

## COUNT IX ~ BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING vs. BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, AND ATLANTIC FISH, INC.

93. Gelfand re-alleges and incorporates by reference Paragraph 1 through 92 as if specifically set forth herein.

94. By reason of the foregoing, the Defendants have breached the implied covenant of good faith and fair dealing which was implied in the relationship between Gelfand and the Defendants.

95. As a result of the breach of implied covenant of good faith and fair dealing by the estate, Gelfand suffered damages and continues to suffer damages as hereinbefore alleged.

### COUNT IX ~ UNFAIR AND DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF CH. 93A

96. Gelfand re-alleges and incorporates by reference Paragraph 1 through 95 as if specifically set forth herein.

97. Gelfand is in the business of investing in companies and as such, is engaged in trade or commerce within the meaning of Mass. Gen. L. ch. 93A, § 1.

98. The Defendants are in the business of operating a wholesale fish business, and as such, is engaged in trade or commerce within the meaning of Mass. Gen. L. ch. 93A, § 1.

99. The Defendants induced Gelfand to pay over to them $500,000.00 without ever intending to make Gelfand a partner in their business, and have refused to recognize or treat Gelfand as a partner. Instead, the Defendants have treated the relationship with Gelfand much in the same manner as between a lender and a borrower.

100. As such, the acts and practices of Sorkin, Wynn, the Goldins and Atlantic Fish alleged above constitute unfair deceptive business acts and practices in violation of Mass. Gen. L. ch. 93A, §§ 1 and 11.

101. As a result of the unfair and deceptive business practices and acts of the Defendants in violation of Mass. Gen. L. ch. 93A, § 2, Gelfand suffered damages and continues to suffer damages as hereinbefore alleged.

WHEREFORE, the Plaintiff, Leon Gelfand, respectfully requests that this Honorable Court:

a. Disgorge the Defendants of all ill gotten funds, award the Plaintiff treble and/or multiple damages, attorney's fees and costs for Defendants Sorkin, David Goldin, Yelanda Goldin, and Wynn's violation of the Racketeering Influenced Corrupt Organizations Act;

b. After a hearing on the merits, order that the that the Defendants, be ordered to provide a full accounting of all funds received from Gelfand;

c. Award the Plaintiff full damages as allowed by law, including by not limited to a return of all funds belonging to the Plaintiff and misappropriated by Defendants;

d. Order that the Plaintiff be awarded double or treble damages, plus interest, attorney's fees and costs, based on the violations of law and unfair and deceptive business practices as herein alleged against the Defendants; and

e. any other awards or remedies the Court deems just and proper.

### JURY DEMAND

The Plaintiff, Leon Gelfand, respectfully demands a trial by jury on all counts triable.

The Plaintiff,
**LEON GELFAND**
By his Attorney,

*(signature)*

Richard F. Ready, Esquire
Law Offices of Richard F. Ready
B.B.O. No. 561947
25 Walnut St., Suite 300
Wellesley, MA 02481-2106
(781) 239-1088

Dated: December 18, 2003