UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS                    U.S. DISTRICT COURT
                                             No. 03 12571 PBS

LEON GELFAND,                )
        Plaintiff,           )
                             )
                             )
vs.                          )
                             )
                             )
BORIS SORKIN, DAVID GOLDIN, YELENA )
GOLDIN, HENRY B. WYNN, and ATLANTIC )
FISH MARKET, INC.,           )
        Defendants           )

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS, DAVID GOLDIN'S AND YELENA GOLDIN'S
**MOTION TO DISMISS**

Now comes the Plaintiff in the above-captioned matter and hereby offers this Memorandum in support of Plaintiff's Opposition to Defendants, David Goldin's and Yelena Goldin's Motion to Dismiss.

**I. INTRODUCTION**

The present action arises out of a complaint filed by the Plaintiff, Leon Gelfand ("Gelfand") against five Defendants, Boris Sorkin ("Sorkin"), David Goldin ("Mr. Goldin"), Yelena Goldin ("Dr. Goldin"), Henry B. Wynn ("Wynn") and the Atlantic Fish Market, Inc. ("Atlantic"). Gelfand in Count I of his complaint pleas for relief pursuant to 18 U.S.C. §1961, 1962, civil RICO, against Sorkin, Mr. Goldin, Dr. Goldin and Wynn and against all defendants for Count II, Accounting; Count III, Breach of Contract; Count IV, Conversion; Count V, Unjust Enrichment; Count VI, Misrepresentation; Count VII, Breach of Fiduciary Duty; Count VIII,

Constructive Trusts; Count IX, Breach of Implied Covenant of Good Faith and Fair Dealing; and, Count IX, Unfair and Deceptive Business Practices in Violation of Mass. Gen.L. Ch. 93A.

## II. **RELEVANT FACTS**

Mr. Goldin and Dr. Goldin are a married couple and prior to this dispute were friends of Gelfand and his family. Ex. A, Plaintiff's Complaint ¶8. Dr. Goldin is a physician, and a corporate officer in several businesses including Brookline Rehabilitation Center, P.C., Medical Center of Greater Mattapan, P.C. and Tax Dispatch, Inc. Ex. B, Mass. Sec. of State Bus. Search, Y. Goldin. Mr. Goldin is Vice President of Defendant Atlantic and is involved in numerous businesses, including Taxi Dispatch, Inc. with Dr. Goldin. Ex. C, Mass. Sec. of State Bus. Search, D. Goldin.

In late 2000, Gelfand approached Dr. Goldin about a loan so that he could purchase a condominium. As a result of this discussion, Gelfand received a loan from Dr. Goldin in the form of $60,000 in cash from which she had at the Fleet Bank. Ex. D, Gelfand Aff. ¶¶4-6. Three months later Gelfand paid the loan back in full.

In mid-December 2001, Dr. Goldin called Gelfand on the telephone and requested a meeting. As requested, Gelfand met later that day with Dr. Goldin at her physical therapy office in Allston, MA. In this meeting, Dr. Goldin explained that she wanted to borrow $100,000 for one month from Gelfand. Ex. A, Compl. ¶¶9, 12; Ex. D, Gelfand Aff. ¶¶8-11. Gelfand indicated that he needed some time to think about the proposed loan and met a few days later with both Mr. and Dr. Goldin at Dr. Goldin's physical therapy office. Ex. D, Gelfand Aff. ¶10.

During this second meeting, Dr. Goldin and Mr. Goldin both represented that Mr. Goldin was in the fish business and that they needed $100,000 so they could buy more product. Dr. Goldin and Mr. Goldin explained that Atlantic was doing very well and had great potential. Ex.

A, Compl. ¶9-14. The Goldins requested that Gelfand make the check payable to Atlantic Fish, Inc., Gelfand agreed as long as both Mr. Goldin and Dr. Goldin remained personally liable on the promissory note. Both Mr. Goldin and Dr. Goldin executed the note on December 21, 2001 and Gelfand wrote a check payable to Atlantic Fish, Inc. in the amount of $100,000. Ex. E, Promissory Note; Ex. F, 12/21/01 check. Later in January 2002, Mr. Goldin asked Gelfand if he would be interested in investing in Atlantic Fish, Inc.

Mr. Goldin then requested that Gelfand meet with Sorkin for the purposes of investing in Atlantic. Dr. Goldin was aware of this meeting. Ex. A, Compl. ¶14-15; Ex. D, Gelfand Aff. ¶13. A meeting was held in the offices of Atlantic at 270 Parsons Street, Brighton, Massachusetts, at which time, Sorkin with Mr. Goldin present, made a presentation touting the potential of Atlantic and its plan to engage in a joint venture to build a fish processing plant in Tallinn, Estonia. Sorkin and Mr. Goldin asked Gelfand if he wanted to invest $250,000, and become a shareholder and to become a partner in the business. Ex. A, Compl. ¶17-22. After the meeting, Dr. Goldin called Gelfand and asked how the meeting went. Gelfand expressed his reservations concerning the venture stating that he did not know Sorkin and that he did not have $250,000 to invest. Dr. Goldin responded to Gelfand's concerns by stating that she trusted Sorkin fully and had been with Sorkin and Mr. Goldin at a fish show in Brussels, and further, that she and Mr. Goldin had themselves invested $250,000 in Atlantic. Mr. Goldin in a separate conversation confirmed Sorkin's representations as well. Ex. A, Compl. ¶9, 22; Ex. D, Gelfand Aff. ¶15-16.

Later in January 2002, Gelfand went to Tallinn, Estonia, where he met with Sorkin and Mr. Goldin, and was introduced to the principal of Watkins and toured the warehouse where the fish processing plant was to be built. Gelfand expressed concern that his proposed investment

would not be large enough to complete the plant construction project. Sorkin then represented that he had $400,000 worth of fish in Estonia and that those proceeds would also be used to help build the plant.[1] Mr. Goldin also represented that he and his wife (Dr. Goldin) had large sums of money in Switzerland which could also be used to support the project. Ex. A, Compl. ¶37.

After Gelfand's return from Tallinn, he was still not sure of whether he would invest in Atlantic and told Dr. Goldin of his concerns. During this time frame, Dr. Goldin called Gelfand just about every day and represented that she had spoken with Mr. Goldin in Tallinn, Estonia and that there was so much demand for the fish the plant was going to produce, they could pick which European companies they wanted to sell to. Gelfand was still uncertain and indicated that he did not have $250,000 available to invest. Mr. and Dr. Goldin, along with Sorkin, all agreed that the $100,000 loaned to the Goldins could be used as part payment on the shares of stock. Ex. A, Compl. ¶38; Ex. D, Gelfand Aff. ¶21-22.

Following assurances from both Mr. Goldin and Dr. Goldin, that the Goldins would remain personally liable on the promissory note, and that the Goldins too had personally invested $250,000, Gelfand agreed to become an investor in Atlantic. Gelfand was instructed by Sorkin to contact the purported corporate attorney, Henry Wynn, who was going to prepare the necessary stock sale documents. For Gelfand's investment, he was to own 10% of the stock in Atlantic and receive 20% of the dividends. Ex. A, Compl. ¶39-42.

On January 29 or 31, 2002, Gelfand, under Wynn's supervision, signed a stock sale agreement, Sorkin signed as well via fax from Tallinn, Estonia. Gelfand concluded his purchase of stock purportedly representing a 10% ownership interest and a 20% interest in dividends

---

[1] It is alleged in a complaints filed in this court that Sorkin and Atlantic failed to pay for a large quantity of fish shipped to Tallinn Estonia, in 2001, H&L Axelsson v. Sorkin, et al, Civil Docket No. 02-cv-10927-RGS and that the freight on the shipments of freight to Estonia also were not paid by Atlantic, Eimskip et al v. Mayflower International and Atlantic Fish, Inc., 02-cv-11499-MEL. Gelfand testified on March 2, 2004 in the latter trial.

directly from Atlantic by wiring on January 31, 2002, $130,000 to the Hansa Bank, Tallinn, Estonia, for the benefit of Front Holding Company. Ex. G, e-mail to Gelfand from Boston Private Bank & Trust Co. On February 5, 2002, Gelfand gave Sorkin a check in the amount of $20,000 payable to Atlantic Fish. When Gelfand went to the Atlantic Fish office to sign the documents he was concerned about signing the agreement because he was also to receive numerous financial statements. Henry Wynn stated that he did not have the documents but Sorkin did and he was in Estonia. Wynn reached Sorkin by phone and Sorkin said he would provide the documents when he returned but that they would lose the Estonia real estate deal if they did not act immediately. Ex. A, Compl. ¶46. According to representations made by Sorkin and Mr. Goldin, Front Holding was the seller of the real estate in Estonia where the fish processing plant was to be located. This representation was also confirmed by Wynn. Ex. A, Compl. ¶44.

In April 2002, Gelfand was called to a meeting at Atlantic Fish by Sorkin and Mr. Goldin, where he asked if he would lend them $250,000. When Gelfand asked why they needed more money they said that there was a good chance they were going to lose the Tallinn real estate because they were late on mortgage payments. Ex. A, Compl. ¶47-53. Gelfand then asked Sorkin about the $400,000 in fish he said he had in Estonia. Sorkin replied that the fish was not selling. Gelfand then asked Mr. Goldin about the money he and Dr. Goldin had in Switzerland and he said it was in a special account and couldn't be touched. Gelfand, fearful he was going to lose his investment, stated that he would not lend Sorkin and Mr. Goldin the money, but he might be willing to invest more. Gelfand later called Dr. Goldin to explain the situation; she was not surprised and told him that he should invest the additional $250,000 or they would all lose everything. Ex. A, Compl. ¶48, 50; Ex. D, Gelfand Aff. ¶33.

Based upon the representations of the Defendants, Gelfand agreed to purchase more stock through Atlantic's purported partner in Estonia. Ex. A, Compl. ¶52-53, Gelfand wired $100,000 to Estonia on May 6, 2002 and the same amount again on May 28, 2002. Gelfand also wired $20,000 to Estonia on July 1, 2002 and $30,000 on July 18, 2002. All of these funds were intended toward the Tallinn, Estonia plant construction project. Ex. A, Compl. ¶47-52. Ex. G, wire transfers.

Late in 2002, Gelfand was asked by Sorkin to re-do his stock sale agreement so that Sorkin could avoid taxes. Gelfand refused and Sorkin became enraged and told Gelfand that Gelfand owned nothing and would never receive any documents. Gelfand has never received an accounting of the $500,000 he "invested." Ex. A, Compl. ¶57-64.

### III. APPLICABLE LAW

Under 18 U.S.C. §1961 (1)-(10), a private cause of action exists against persons who engage in a pattern of racketeering activity while committing prohibited acts as set forth in 18 U.S.C. §1962 (a)-(d). The plaintiff bears the burden of showing that the Defendants have engaged in two or more acts of racketeering, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1985). The predicate acts must be related so as to have "... similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern Bell Tel. Co.*, at 240. "The relatedness test is not a cumbersome one for a RICO plaintiff..." the plaintiff may satisfy the relatedness requirement by a fact-specific allegation of a common theme. *Feinstein v. Resolution Trust Corp.*, 942 F.2d. 34, 44 (1st Cir. 1991). The predicate acts may form a pattern

of racketeering even if "...they are not separate illegal schemes". *H.J. Inc. v. Northwestern Bell Tel. Co.*, at 236.

A RICO plaintiff must also show that the criminal activity continues or that the predicate acts pose a threat of continued activity. Id. at 242. A pattern of criminal activity may be demonstrated by a showing of a series of acts, even if they are not continuous, if the related predicate acts extended over a substantial period of time. *Financial Advisors & Consultants, Inc. v. Cooperativa de Seguros de Vida*, 106 F. Supp. 2d. 244, 256-57 (D.P.R. 2000). In the alternative, a RICO plaintiff can satisfy the continuity requirement if there is a realistic prospect that the prohibited activity will extend over an open-ended period of time. *Libertad v. Welch*, 53 F.3d. 428, 445 (1st Cir. 1995).

The prohibited activities under RICO include: investing or using funds derived through a pattern of racketeering (18 U.S.C. §1962(a)); acquiring control of the enterprise through a pattern of racketeering (§1962(b)); conducting or participating in the affairs of the enterprise through a pattern of racketeering (§1962(c)); or conspiring to engage in any of the above proscribed activities (§1962(d)).

A Complaint, even if inartfully drafted, should not be dismissed if sufficient facts have been alleged against the defendant. *Sisbarro v. Warden*, 592 F.2d 1, 2 (1st Cir. 1979). "Where a plaintiff fails to articulate a claim with specificity . . . district courts should be liberal in granting leave to amend. . . ." *DiPerri v. FAA*, 671 F.2d 54, 59, n.4 (1st Cir. 1982). A Complaint, under civil RICO should not be dismissed under Fed. R. Civ. P. 9 (b) if it is likely that a defendant has used interstate mails or wire in the commission of fraud and where the information is in the exclusive control of the defendant. *Ahmed v. Rosenblatt*, 118 F.3d 886, 889-90 (1st Cir. 1997); New England Data Serv., Inc. v. Becher, 829 F. 2d 286, 290 (1st Cir. 1987). In such

circumstances, the First Circuit, pursuant to its "second determination" approach, may deny the defendant's motion to dismiss and allow the plaintiff to conduct discovery and later amend the complaint. *Feinstein v. Resolution Trust Corp.*, 942 F. 2d 34, 44 (1st Cir. 1997); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).

Under Fed. R. Civ.15, the court may act sua sponte or by motion, by a moving party and grant the plaintiff an opportunity to amend the complaint. This opportunity to amend the complaint may be granted following or during its consideration of a Rule 12(b)(6) motion. *DiPierri v. FAA*, 671 F.2d 54, 59 n.4 (1st Cir. 1982).

## IV. <u>ARGUMENT</u>

**A. The Defendants' Motion to Dismiss should be denied because Mr. and Dr. Goldin have committed numerous predicate acts and used Atlantic Fish Market, Inc., as a vehicle to defraud Gelfand of his investment.**

RICO prohibits a person employed or associated with an enterprise from engaging in predicate crimes 18 U.S.C. §1962(c). Under RICO, a person is defined as anyone who is capable of holding a beneficial interest in property 18 U.S.C. §1961(3).

Gelfand first became associated with Atlantic following Dr. Goldin's request that he make a $100,000 loan to Mr. and Dr. Goldin. Ex. A, Compl. ¶¶9-13; Ex. D, Gelfand Aff. ¶¶8-10; see also, Promissory Note Ex. E; and Ex. F, 12/21/01 check. In fact, it was only because Dr. Goldin had previously lent Gelfand money and his prior personal relationship with the Goldins that he became involved in Atlantic Fish at all. Ex. A, Compl. ¶¶9-13; Ex. D, Gelfand Aff. ¶¶4-6.

In January 2002, shortly after the $100,000 loan, Mr. and Dr. Goldin both encouraged Gelfand to become an investor in Atlantic and emphasized that the representations made by

Sorkin concerning the business were true. Ex. A, Compl. ¶14-24; Ex. D, Gelfand Aff. ¶14-16. Moreover, in January 2002, prior to Gelfand's investment in Atlantic, Dr. Goldin represented that she had been with her husband and Sorkin at a Fish Show in Brussels and that they (the Goldins) had already invested in Atlantic. Ex. A, Compl. ¶9; Ex. D, Gelfand Aff. ¶15. Gelfand alleges that these initial predicate acts by both Mr. and Dr. Goldin led to his "investment" in Atlantic and were intended to defraud him of his money. In an act to further induce Gelfand, Mr. and Dr. Goldin agreed that Gelfand could use the money "lent" to the Goldins as part payment on his investment in Atlantic and also that he could retain the $100,000 promissory as a promise to repay him. Ex. A, Compl. ¶38. Gelfand was also told by both Goldins that monies he was investing would assist in the purchase of real estate in Estonia where a fish processing plant was to be built. In exchange for his investment, Gelfand received from Sorkin, 10 shares of common stock in Atlantic. Ex. I, Stock Purchase Agreement; Ex. D, Gelfand Aff. ¶14.

On January 31, 2002, as a direct result of the representations and inducements by both Mr. and Dr. Goldin, Gelfand in fact invested monies into Atlantic. Ex. A, Compl. ¶24-35. Sorkin and the Goldins agreed that the $100,000 that Gelfand lent Mr. and Dr. Goldin could be used for the purchase of stock. These predicate acts committed by Mr. and Dr. Goldin in concert with the other individual Defendants caused Gelfand on January 31, 2002, to wire $130,000 in foreign commerce to the Hansan Bank in Tallinn, Estonia for the benefit of the Front Holding Company who Sorkin stated owned the property that was to be purchased where a fish processing plan was to be built. Ex. G, wire transfer. Also pursuant to their agreement, on February 5, 2003, Gelfand wrote a check payable to Atlantic in the amount of $20,000. Ex. F, 2/5/03 check.

The acts and representations of Dr. Goldin and Mr. Goldin caused the $100,000 in funds originally meant for them alone, to become merged into Atlantic, an enterprise that was being used for criminal purposes. Prior to his investment, Sorkin stated in front of Mr. Goldin that Atlantic had $400,000 worth of fish that was to be used in the construction of the Estonia plant. It is reasonable to infer that Mr. Goldin as Vice President of Atlantic knew at the time the stock was sold to Gelfand that the $400,000 worth of fish in Estonia which was represented as an asset of Atlantic, was obtained by fraudulent means earlier in 2001, at the expense of H&L Axelsson and Eimskip. It is also reasonable to infer that Dr. Goldin as his wife and as an active investor who had attended the European fish show and business meetings with her husband and Sorkin, also knew that Atlantic was being used to gain assets by fraudulent means. Ex. H, Trip Report; see also *H&L Axelsson v. Sorkin, et al*, U.S District Court, Civil Docket No. 02-CV-10927-RGS (non-payment on a large shipment of fish); (and for the non-payment of freight on the fish shipped to Tallinn, Estonia). *Eimskip et al v. Mayflower International, Ltd. and Atlantic Fish*, Civil Docket No. 02-CV-11499MEL. The efforts of both Dr. Goldin and Mr. Goldin resulted in a merger of the proceeds of their loan from Gelfand into Atlantic and were clearly designed to defraud Gelfand of his money. Defendants, Dr. Goldin and Mr. Goldin cannot be heard to argue that they with did not commit sufficient predicate acts or that they were not associated with Atlantic, an enterprise which was clearly used as a vehicle for criminal activity.

In April and May, 2002, Sorkin and Mr. Goldin and Dr. Goldin made representations to Gelfand that they all would lose their money if additional monies were not invested. This caused Gelfand to invest further funds in the enterprise. Specifically, on May 6, 2002, Gelfand wired $100,000 from his Boston bank account to the Hansa Bank, Tallinn, Estonia, to Watkins, who was allegedly a joint venture partner with Atlantic. On May 28, 2002, Gelfand wired an

additional $100,000 to Watkins. On July 1, 2002, Gelfand wired $20,000 payable to Atlas, and lastly on July 18, 2002, he wired $30,000 to the Hansa Bank allegedly to pay a contractor working on the fish processing plant. See Ex. G, wire transfers from Boston Private Bank and Trust; Ex. D, Gelfand Aff. ¶34-36.

In numerous instances, Mr. and Dr. Goldin confirmed the representations made by Sorkin. Wynn, who identified himself as the corporate attorney, also confirmed the statements of Sorkin.[2] Ex. A, Compl. ¶40-46. These affirmations on the part of Mr. and Dr. Goldin occurred during phone conversations and in personal meetings between Gelfand and Ms. and Dr. Goldin over a period of several months. Specifically, in August 2002, both Mr. and Dr. Goldin had business meetings with Gelfand in Tallinn Estonia, concerning his "investment' and the construction of the fish processing plant.

The above clearly demonstrates that Dr. Goldin and Mr. Goldin have committed numerous predicate acts and have used Atlantic as the enterprise designed to defraud Gelfand of $500,000.

**B.   The predicate acts of Dr. Goldin and Mr. Goldin are part of a pattern related to their intent to defraud Gelfand of his savings.**

The pattern of conduct in this matter on the part of the individual Defendants were related in their purpose and intent to further lure Gelfand in as an investor and then defraud him of his money. As such, Gelfand in his Complaint has demonstrated that these events were not isolated, but rather were a pattern of conduct. See, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Feinstein v. Resolution Trust Corp.*, 942 F.2d. 34, 44 (1st Cir. 1991).

---

[2] Henry B. Wynn had his license to practice law in the Commonwealth of Massachusetts suspended on March 18, 1988, and again on July 14, 1989, and remains on a suspended status. Mr. Wynn was a party in a disbarment proceeding in U.S. District Court of Massachusetts. In Re: *Wynn v. MBD*, 99-MC-10255.

As demonstrated herein, the facts as alleged by Gelfand are plead with sufficient particularity to support a finding that the fraudulent acts of Defendants continued over a substantial period of time and are a threat to continue indefinitely. The predicate acts began in December, 2001, when Dr. Goldin first approached Gelfand for a loan after learning that he had acquired monies through the sale of real estate. Ex. A, Compl. ¶9. The acts continued when Dr. Goldin and Mr. Goldin lured Gelfand into Atlantic, first by asking him to make the check on the $100,000 loan payable to Atlantic, and then in January, 2002, when Sorkin, Mr. Goldin and Dr. Goldin convinced Gelfand that he should become an investor in Atlantic. Mr. Goldin and Dr. Goldin made numerous intentional misrepresentations concerning Atlantic and Sorkin. When Gelfand voiced any concern, both Mr. Goldin and Dr. Goldin made repeated assurances intended to further defraud Gelfand. Paramount to Gelfand's decision to "invest" was Dr. Goldin's continued representations and assurances, including a guarantee by Dr. Goldin that they would reimburse in for his investment if Gelfand wanted to get out of Atlantic.

These assurances continued into the spring and summer of 2002, including statements by Sorkin which were confirmed by David Goldin that Atlantic had $400,000 worth of fish the proceeds from the sale of which would help build the Tallinn, Estonia, fish processing plant. As noted above, actions have been brought in this Court against Atlantic for non-payment on a large quantity of fish shipped to Tallinn, Estonia. *H&L Axelsson v. Sorkin, et al*, Civil Docket No. 02-CV-10927-RGS and for the non-payment of freight on the fish shipped to Tallinn, Estonia. *Eimskip et al v. Mayflower International, Ltd. and Atlantic Fish,* Civil Docket No. 02-CV-11499MEL. It is believed that further discovery will demonstrate that the $400,000 worth of fish Sorkin and Mr. Goldin represented to Gelfand as assets of Atlantic did in fact belong to H&L

Axelsson and were procured through fraudulent means. Also of importance is that Mr. Goldin continues to act as Vice President of Atlantic and both Goldins are active investors in Atlantic.

### C. The allegations in the Plaintiff's Complaint clearly demonstrate that the predicate acts committed by the named Defendants were part of a related pattern for the singular purpose of stealing from Gelfand his life's savings.

The facts as alleged by Gelfand in his complaint and the reasonable inferences that can be drawn therefrom, demonstrate that Dr. Goldin and Mr. Goldin had knowledge that Gelfand had sold real estate and they shared this knowledge with Sorkin. The predicate acts and pressure tactics employed by the Defendants were nothing more than a shell game designed for the purpose of defrauding Gelfand.

This fraudulent scheme not only included trusted family friends (the Goldins) but also included the use of a disbarred attorney (Wynn) to lend an air of legitimacy. There can be little doubt that the predicate acts were intended for a similar purpose. See *Financial Advisors & Consultants, Inc. v. Cooperativa de Seguros de Vida*, 106 F. Supp. 2d 244, 257 (D.P.R. 2000) (finding "relatedness" requirement met where allegation in complaint were the same or similar to obtain kickbacks in exchange . . . for Medicare claims).

### D. The Defendants' Motion to Dismiss should be denied because there is a real threat of continued criminal activity.

The facts as alleged in the Plaintiff's complaint clearly demonstrate that Sorkin, as President, Mr. Goldin as Vice President and Dr. Goldin as an active investor continue to be associated with Atlantic and use this enterprise as a vehicle for criminal and fraudulent conduct. There can be no doubt that Mr. Goldin and Dr. Goldin continue to be associated with the enterprise and have a pecuniary interest in its fraudulent activities.

As stated above, it was Dr. Goldin and Mr. Goldin who sought out Gelfand and convinced him to invest in Atlantic. It is reasonable to infer that more evidence of the Defendants continued involvement with Atlantic will be uncovered through discovery. It is a fact that other plaintiffs in this court continue to seek payment on fish shipped to Estonia on Atlantic's behalf. According to an investigative report generated by Mayflower International Ltd, ". . . it appears that Sorkin is together with Watkins for the establishment of a canning operation . . . together they are using funds from sales of H&L Axelsson Fish." Ex. H, Trip Report p.2. *H&L Axelsson v. Sorkin, et.al.*, 02-CV-10927-RGS.

It is clear from the facts already uncovered, that Dr. Goldin and Mr. Goldin used their personal relationship with Gelfand to lure him in as an investor in Atlantic. Mr. Goldin, as Vice President of Atlantic, knew that the fish Sorkin claimed as belonging to Atlantic, in fact belonged to H&L Axelsson. It is also apparent that Dr. Goldin and Mr. Goldin made continuous misrepresentations they knew were false. These misrepresentations were intended to defraud Gelfand by causing him to wire transfer vast amounts of his money in foreign commerce to Estonia.

The named Defendants continue their predicate acts through their association with Atlantic.

### E. The Plaintiff has sufficiently alleged that he has suffered injury by the illegal use of his investment in Atlantic.

There can be no reasonable argument that Gelfand did not suffer serious injury as a direct result of the collective acts of the Defendants. By the collective acts of the Defendants, Gelfand was caused to wire monies in foreign commerce, resulting in fraud. The acts of the Defendants caused Gelfand to lose his life's savings resulting in severe hardship to him and to his family.

F.  **The Defendants' Motion to Dismiss should be denied because the Plaintiff is entitled to an opportunity to amend his complaint after a period of discovery, pursuant to *New England Data Servs, Inc. v. Becher*, 829 F. 2d 286 (1st Cir. 1987).**

As alleged in the Plaintiff's complaint and supported by the affidavit of Robert C. Horgan, Esquire, the Plaintiff requested and was denied numerous corporate documents. Ex. J, Affidavit of Robert C. Horgan, Esquire. It is asserted in good faith that a period of discovery will reveal the Defendants' complicity in this illegal scheme. Since the Defendants control the flow of information, the Defendants' motion to dismiss should be denied and the Plaintiff should be allowed to proceed with discovery and/or amend his complaint.

## V. CONCLUSION

As alleged with sufficient specificity, the Defendants named in this case have committed numerous predicate acts over a substantial period of time. The Defendants' efforts, through their association with Atlantic, were intended to defraud Gelfand and other plaintiffs in this court.

Gelfand and his family have suffered severe economic harm as a direct result of the Defendants' acts.

For the forgoing reasons, the Defendants' motion to dismiss should be denied.

> Respectfully submitted,
> LEON GELFAND, Plaintiff
>
> By his attorney,
>
> _____
> Richard F. Ready, Esquire
> Law Offices of Richard F. Ready
> 25 Walnut Street, Suite #300
> Wellesley, MA 02481
> (781) 239-1088
> BBO #561947

Dated: March 17, 2004