UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS                                      U.S. DISTRICT COURT
                                                               No. 03 12571 PBS

**LEON GELFAND,**
   **Plaintiff,**

*vs.*

**BORIS SORKIN, DAVID GOLDIN, YELENA GOLDIN, HENRY B. WYNN, and ATLANTIC FISH MARKET, INC.,**
   **Defendants**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT, HENRY B. WYNN'S MOTION TO DISMISS**

Now comes the Plaintiff in the above-captioned matter and hereby offers this Memorandum in support of Plaintiff's Opposition to Defendant Henry B. Wynn's Motion to Dismiss.

## I. INTRODUCTION

The present action arises out of a complaint filed by the Plaintiff, Leon Gelfand ("Gelfand") against five Defendants, Boris Sorkin ("Sorkin"), David Goldin ("Mr. Goldin"), Yelena Goldin ("Dr. Goldin"), Henry B. Wynn ("Wynn") and the Atlantic Fish Market, Inc. ("Atlantic"). Gelfand in Count I of his complaint pleas for relief pursuant to 18 U.S.C. §1961, 1962, civil RICO, against Sorkin, Mr. Goldin, Dr. Goldin and Wynn and against all defendants for Count II, Accounting; Count III, Breach of Contract; Count IV, Conversion; Count V, Unjust Enrichment; Count VI, Misrepresentation; Count VII, Breach of Fiduciary Duty; Count VIII, Constructive Trusts; Count IX, Breach of Implied Covenant of Good Faith and Fair Dealing; and, Count IX, Unfair and Deceptive Business Practices in Violation of Mass. Gen.L. Ch. 93A.

## II. <u>RELEVANT FACTS</u>

In January 2002, Wynn represented himself to the Plaintiff as corporate counsel for Atlantic and was involved in the negotiation and execution of the stock sale agreement which resulted in the Plaintiff investing $250,000 in Atlantic. Ex. A, Compl. ¶ 39, 40, 43, 44; Ex. B, Aff. Robert C. Horgan. In fact, however, Wynn's license to practice law has been suspended since March 18, 1988. During the active phase of luring the Plaintiff into this fraudulent scheme, all of the Defendants referred to Wynn as the corporate attorney for Atlantic.

In mid-December 2001, Dr. Goldin called Gelfand on the telephone and requested a meeting. As requested, Gelfand met later that day with Dr. Goldin at her physical therapy office in Allston, MA. In this meeting, Dr. Goldin explained that she wanted to borrow $100,000 for one month from Gelfand. Ex. A, Compl. ¶9, 12. Gelfand met a few days later with both Mr. and Dr. Goldin at Dr. Goldin's physical therapy office. Ex. A, Compl. ¶9, 12.

During this second meeting, Dr. Goldin and Mr. Goldin both represented that Mr. Goldin was in the fish business and that they needed $100,000 so they could buy more product. Dr. Goldin and Mr. Goldin explained that Atlantic was doing very well and had great potential. Ex. A, Compl. ¶9-14. The Goldins requested that Gelfand make the check payable to Atlantic Fish, Inc., Gelfand agreed as long as both Mr. Goldin and Dr. Goldin remained personally liable on the promissory note. Both Mr. Goldin and Dr. Goldin executed the note on December 21, 2001 and Gelfand wrote a check payable to Atlantic Fish, Inc. in the amount of $100,000. Later in January 2002, Mr. Goldin asked Gelfand if he would be interested in investing in Atlantic Fish, Inc.

Mr. Goldin then requested that Gelfand meet with Sorkin for the purposes of investing in Atlantic. Dr. Goldin was aware of this meeting. Ex. A, Compl. ¶14-15. A meeting was held in the offices of Atlantic at 270 Parsons Street, Brighton, Massachusetts, at which time, Sorkin with

Mr. Goldin present, made a presentation touting the potential of Atlantic and its plan to engage in a joint venture to build a fish processing plant in Tallinn, Estonia. Wynn worked out of the exact same office as Atlantic. Sorkin and Mr. Goldin asked Gelfand if he wanted to invest $250,000, and become a shareholder and to become a partner in the business. Ex. A, Compl. ¶17-22. After the meeting, Dr. Goldin called Gelfand and asked how the meeting went. Gelfand expressed his reservations concerning the venture stating that he did not know Sorkin and that he did not have $250,000 to invest. Dr. Goldin responded to Gelfand's concerns by stating that she trusted Sorkin fully and had been with Sorkin and Mr. Goldin at a fish show in Brussels, and further, that she and Mr. Goldin had themselves invested $250,000 in Atlantic. Mr. Goldin in a separate conversation confirmed Sorkin's representations as well. Ex. A, Compl. ¶9, 22.

Later in January 2002, Gelfand went to Tallinn, Estonia, where he met with Sorkin and Mr. Goldin, and was introduced to the principal of Watkins and toured the warehouse where the fish processing plant was to be built. Gelfand expressed concern that his proposed investment would not be large enough to complete the plant construction project. Sorkin then represented that he had $400,000 worth of fish in Estonia and that those proceeds would also be used to help build the plant.[1] Mr. Goldin also represented that he and his wife (Dr. Goldin) had large sums of money in Switzerland which could also be used to support the project. Ex. A, Compl. ¶37.

After Gelfand's return from Tallinn, he was still not sure of whether he would invest in Atlantic and told Dr. Goldin of his concerns. During this time frame, Dr. Goldin called Gelfand just about every day and represented that she had spoken with Mr. Goldin in Tallinn, Estonia and that there was so much demand for the fish the plant was going to produce, they could pick

---

[1] It is alleged in a complaints filed in this court that Sorkin and Atlantic failed to pay for a large quantity of fish shipped to Tallinn Estonia, in 2001, H&L Axelsson v. Sorkin, et al, Civil Docket No. 02-cv-10927-RGS and that the freight on the shipments of freight to Estonia also were not paid by Atlantic, Eimskip et al v. Mayflower International and Atlantic Fish, Inc., 02-cv-11499-MEL. Gelfand testified on March 2, 2004 in the latter trial.

which European companies they wanted to sell to. Gelfand was still uncertain and indicated that he did not have $250,000 available to invest. Mr. and Dr. Goldin, along with Sorkin, all agreed that the $100,000 loaned to the Goldins could be used as part payment on the shares of stock. Ex. A, Compl. ¶38.

Following assurances from both Mr. Goldin and Dr. Goldin, that the Goldins would remain personally liable on the promissory note, and that the Goldins too had personally invested $250,000, Gelfand agreed to become an investor in Atlantic. Gelfand was instructed by Sorkin to contact the purported corporate attorney, Henry Wynn, who was going to prepare the necessary stock sale documents. For Gelfand's investment, he was to own 10% of the stock in Atlantic and receive 20% of the dividends. Ex. A, Compl. ¶39-42.

On January 29 or 31, 2002, Gelfand, under Wynn's supervision, signed a stock sale agreement, Sorkin signed as well via fax from Tallinn, Estonia. During this time frame Wynn had direct discussions with Gelfand's attorney and did not at any time state that his license to practice law had been suspended or that he was working under the supervision of another attorney. Ex. B, Aff. Robert C. Horgan, Esquire. Moreover, Wynn as the draftsman of the stock sale agreement knew and did not disclose at the time of its execution, that claims had been made by H & L Axelsson and by Eimskip that materially and adversely impacted the assets of Atlantic.

Gelfand concluded his purchase of stock purportedly representing a 10% ownership interest and a 20% interest in dividends directly from Atlantic by wiring on January 31, 2002, $130,000 to the Hansa Bank, Tallinn, Estonia, for the benefit of Front Holding Company. On February 5, 2002, Gelfand gave Sorkin a check in the amount of $20,000 payable to Atlantic Fish. When Gelfand went to the Atlantic Fish office to sign the documents he was concerned about signing the agreement because he was also to receive numerous financial statements. At

this meeting, Henry Wynn stated that he did not have the documents but Sorkin did and he was in Estonia. Wynn reached Sorkin by phone and Sorkin said he would provide the documents when he returned but that they would lose the Estonia real estate deal if they did not act immediately. Ex. A, Compl. ¶46. According to representations made by Sorkin and Mr. Goldin, Front Holding was the seller of the real estate in Estonia where the fish processing plan was to be located. This representation was also confirmed by Wynn. Ex. A, Compl. ¶44.

In April 2002, Gelfand was called to a meeting at Atlantic Fish by Sorkin and Mr. Goldin, where he asked if he would lend them $250,000. When Gelfand asked why they needed more money they said that there was a good chance they were going to lose the Tallinn real estate because they were late on mortgage payments. Ex. A, Compl. ¶47-53. Gelfand then asked Sorkin about the $400,000 in fish he said he had in Estonia. Sorkin replied that the fish was not selling. Gelfand then asked Mr. Goldin about the money he and Dr. Goldin had in Switzerland and he said it was in a special account and couldn't be touched. Gelfand, fearful he was going to lose his investment, stated that he would not lend Sorkin and Mr. Goldin the money, but he might be willing to invest more. Gelfand later called Dr. Goldin to explain the situation; she was not surprised and told him that he should invest the additional $250,000 or they would all lose everything. Ex. A, Compl. ¶48, 50.

Based upon the representations of the Defendants, Gelfand agreed to purchase more stock through Atlantic's purported partner in Estonia. Ex. A, Compl. ¶52-53, Gelfand wired $100,000 to Estonia on May 6, 2002 and the same amount again on May 28, 2002. Gelfand also wired $20,000 to Estonia on July 1, 2002 and $30,000 on July 18, 2002. All of these funds were intended toward the Tallinn, Estonia plant construction project. Ex. A, Compl. ¶47-52.

Late in 2002, Sorkin stated that upon the recommendation of Wynn and his accountant that the stock sale agreement needed to "re-done" so that Sorkin could avoid taxes. Gelfand was concerned that he was being asked to participate in tax fraud and refused. Sorkin became enraged and told Gelfand that Gelfand owned nothing and would never receive any documents. Gelfand has never received an accounting of the $500,000 he "invested." Ex. A, Compl. ¶57-64.

### III. WYNN'S LAW LICENSE STATUS

In 2003, when Wynn was challenged on his law license status, he stated in a letter to Attorney Horgan that it was "… Attorney Gerald J. Zyfers…" who was corporate counsel to Atlantic. Ex. C, October 9, 2003 letter from Henry B. Wynn & Associates. Attorney Zyfers has filed appearances in this matter on behalf on Sorkin and Atlantic. In fact, Wynn's license to practice law was suspended in the Commonwealth of Massachusetts on March 18, 1988 (and continues to be suspended), and he was a party in a disbarment proceeding in this court in the matter of, In Re: Wynn, 99-mc-10255. Importantly, Wynn has been under an Order of the Massachusetts Supreme Judicial Court to refrain from engaging in paralegal work, except for and under, the supervision of Attorney Jordan Ring or Attorney Roberta Golden. In Re: Henry B. Wynn, No. BD87-022, Greaney, J. (March 5, 1999). Ex. D, SJC Order. Wynn never informed the Plaintiff or his counsel, Robert C. Horgan, Esquire, that his license to practice law had been suspended or that he was working on behalf of another attorney. Wynn has an office located at 270 Parsons Street, Brighton, MA and used letterhead entitled "Henry B. Wynn & Associates." Attorney Jordan Ring has an office located at 4 Longfellow Place, 37th floor, Boston, MA. The Massachusetts Supreme Judicial Court ordered an immediate suspension of Attorney Roberta Golden's license to practice law on April 8, 2002, (Greaney, J.), Ex. E, BBO website notices.

Moreover, Attorney Neil Marshall Brown, in a November 18, 2003 letter to Attorney Horgan, indicated he was representing Wynn and stated that "…[m]y understanding is that Attorney Zyfers … was the principal draftsman of the corporate documents…" and that Wynn's … involvement …was minimal at best…" and further that "…at all relevant times…" Wynn "…was working as a paralegal under the supervision and direction of Attorney John A. Zizza who is presently in Florida until the end of the month…" Ex. F, Attorney Brown letter, November 18, 2003. Attorney Brown is not representing Wynn in this action, who is pro se, but has filed appearances in this matter for Mr. Goldin and Dr. Goldin.

## IV. APPLICABLE LAW

Under 18 U.S.C. §1961 (1)-(10), a private cause of action exists against persons who engage in a pattern of racketeering activity while committing prohibited acts as set forth in 18 U.S.C. §1962 (a)-(d). The plaintiff bears the burden of showing that the Defendants have engaged in two or more acts of racketeering, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1985). The predicate acts must be related so as to have "… similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern Bell Tel. Co.*, at 240. "The relatedness test is not a cumbersome one for a RICO plaintiff…" the plaintiff may satisfy the relatedness requirement by a fact-specific allegation of a common theme. *Feinstein v. Resolution Trust Corp.*, 942 F.2d. 34, 44 (1st Cir. 1991). The predicate acts may form a pattern of racketeering even if "…they are not separate illegal schemes". *H.J. Inc. v. Northwestern Bell Tel. Co.*, at 236.

A RICO plaintiff must also show that the criminal activity continues or that the predicate acts pose a threat of continued activity. Id. at 242. A pattern of criminal activity may be

demonstrated by a showing of a series of acts, even if they are not continuous, if the related predicate acts extended over a substantial period of time. *Financial Advisors & Consultants, Inc. v. Cooperativa de Seguros de Vida*, 106 F. Supp. 2d. 244, 256-57 (D.P.R. 2000). In the alternative, a RICO plaintiff can satisfy the continuity requirement if there is a realistic prospect that the prohibited activity will extend over an open-ended period of time. *Libertad v. Welch*, 53 F.3d. 428, 445 (1st Cir. 1995).

The prohibited activities under RICO include: investing or using funds derived through a pattern of racketeering (18 U.S.C. §1962(a)); acquiring control of the enterprise through a pattern of racketeering (§1962(b)); conducting or participating in the affairs of the enterprise through a pattern of racketeering (§1962(c)); or conspiring to engage in any of the above proscribed activities (§1962(d)).

A Complaint, even if inartfully drafted, should not be dismissed if sufficient facts have been alleged against the defendant. *Sisbarro v. Warden*, 592 F.2d 1, 2 (1st Cir. 1979). "Where a plaintiff fails to articulate a claim with specificity . . . district courts should be liberal in granting leave to amend. . . ." *DiPerri v. FAA*, 671 F.2d 54, 59, n.4 (1st Cir. 1982). A Complaint, under civil RICO should not be dismissed under Fed. R. Civ. P. 9 (b) if it is likely that a defendant has used interstate mails or wire in the commission of fraud and where the information is in the exclusive control of the defendant. *Ahmed v. Rosenblatt*, 118 F.3d 886, 889-90 (1st Cir. 1997); *New England Data Serv., Inc. v. Becher*, 829 F. 2d 286, 290 (1st Cir. 1987). In such circumstances, the First Circuit, pursuant to its "second determination" approach, may deny the defendant's motion to dismiss and allow the plaintiff to conduct discovery and later amend the complaint. *Feinstein v. Resolution Trust Corp.*, 942 F. 2d 34, 44 (1st Cir. 1997); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).

Under Fed. R. Civ.15, the court may act sua sponte or by motion, by a moving party and grant the plaintiff an opportunity to amend the complaint. This opportunity to amend the complaint may be granted following or during its consideration of a Rule 12(b)(6) motion. *DiPierri v. FAA*, 671 F.2d 54, 59 n.4 (1st Cir. 1982).

## V. ARGUMENT

**A.  The Defendant's Motion to Dismiss should be denied because Wynn, along with the other named Defendants, have committed numerous predicate acts and used Atlantic Fish Market, Inc., as a vehicle to defraud Gelfand of his investment.**

RICO prohibits a person employed or associated with an enterprise from engaging in predicate crimes 18 U.S.C. §1962(c). Under RICO, a person is defined as anyone who is capable of holding a beneficial interest in property 18 U.S.C. §1961(3).

Wynn was a central figure in the scheme to defraud Gelfand of his money. As stated above, Wynn discussed with Gelfand's attorney, Robert C. Horgan, the particulars of the stock sale agreement. Importantly, prior to his investment, Sorkin stated in front of Mr. Goldin that Atlantic had $400,000 worth of fish that was to be used in the construction of the Estonia plant. It is reasonable to infer that Wynn, who represented himself as corporate counsel for Atlantic, knew at the time the stock was sold to Gelfand that the $400,000 worth of fish in Estonia, which was represented as an asset of Atlantic, was obtained by fraudulent means earlier in 2001, and at the expense of H&L Axelsson and Eimskip. See, *H&L Axelsson v. Sorkin, et al*, U.S District Court, Civil Docket No. 02-CV-10927-RGS (non-payment on a large shipment of fish); (and for the non-payment of freight on the fish shipped to Tallinn, Estonia). *Eimskip et al v. Mayflower International, Ltd. and Atlantic Fish*, Civil Docket No. 02-CV-11499MEL. It is asserted in good faith that discovery will likely reveal that Wynn knew of H&L Axelsson's and Mayflower's claims that Atlantic and Sorkin owed them the cost of the fish and freight when he drafted the

stock sale agreement and that those portions of the agreement that indicated that Sorkin was unaware of any claims that would materially impact on the corporation, were lies, intended to defraud Gelfand.

In numerous instances, Mr. Goldin and Dr. Goldin confirmed the representations made by Sorkin. Wynn, who identified himself as the corporate attorney, also confirmed the statements of Sorkin. Ex. A, Compl. ¶40-46. Wynn, with his years of experience as an attorney, however checkered, cannot credibly claim that he did not know that the representations he and the other Defendants made were untrue or that he was not an active participate in the criminal enterprise. These affirmations on the part of Wynn as to the veracity of Sorkin's statements and as to the existence of corporate documents occurred over a period of several months.

The above clearly demonstrates that Wynn and the other named Defendants have committed numerous predicate acts and have used Atlantic as the enterprise designed to defraud Gelfand of $500,000.

**B.    The predicate acts of Wynn and the other Defendants were part of a pattern related to their intent to defraud Gelfand of his savings.**

The pattern of conduct in this matter on the part of the individual Defendants were related in their purpose and intent to further lure Gelfand in as an investor and then defraud him of his money. As such, Gelfand in his Complaint has demonstrated that these events were not isolated, but rather were a pattern of conduct. See, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Feinstein v. Resolution Trust Corp.*, 942 F.2d. 34, 44 (1st Cir. 1991).

As demonstrated herein, the facts as alleged by Gelfand are plead with sufficient particularity to support a finding that the fraudulent acts of Defendants continued over a substantial period of time and are a threat to continue indefinitely. The predicate acts began in December, 2001, when Dr. Goldin first approached Gelfand for a loan after learning that he had

acquired monies through the sale of real estate and continued via acts of Wynn and others leading up to the execution of the stock purchase agreement in January 2002. Wynn and the other Defendants continued in there efforts to further defraud Gelfand until he lost his life's savings of $500,000.

This fraudulent scheme not only included trusted family friends (the Goldins) but also included the use of a disbarred attorney (Wynn) to lend an air of legitimacy. There can be little doubt that the predicate acts were intended for a similar purpose. See *Financial Advisors & Consultants, Inc. v. Cooperativa de Seguros deVida*, 106 F. Supp. 2d 244,257 (D.P.R. 2000) (finding "relatedness" requirement met where allegation in complaint were the same or similar to obtain kickbacks in exchange . . . for Medicare claims).

### D. The Defendants' Motion to Dismiss should be denied because there is a real threat of continued criminal activity.

The facts as alleged in the Plaintiff's complaint clearly demonstrate that Wynn as purported "corporate counsel", Sorkin, as President, Mr. Goldin as Vice President and Dr. Goldin as an active investor continue to be associated with Atlantic and use this enterprise as a vehicle for criminal and fraudulent conduct. It is reasonable to infer that more evidence of the Defendants continued involvement with Atlantic will be uncovered through discovery. It is a fact that other plaintiffs in this court continue to seek payment on fish shipped to Estonia on Atlantic's behalf.

It is clear from the facts already uncovered, that Dr. Goldin and Mr. Goldin used their personal relationship with Gelfand to lure him in as an investor in Atlantic. Mr. Goldin, as Vice President of Atlantic, knew that the fish Sorkin claimed as belonging to Atlantic, in fact belonged to H&L Axelsson. It is also apparent that Dr. Goldin and Mr. Goldin made continuous misrepresentations they knew were false. These misrepresentations were intended to defraud

Gelfand by causing him to wire transfer vast amounts of his money in foreign commerce to Estonia. It is also clear that Wynn, by asserting that he was corporate counsel, with all of the expected ethical obligations that attach to that status, was intending to lend an air of "legitimacy" and was an integral part of the scheme to defraud Gelfand.

The named Defendants continue their predicate acts through their association with Atlantic.

E.  **The Plaintiff has sufficiently alleged that he has suffered injury by the illegal use of his investment in Atlantic.**

There can be no reasonable argument but that Gelfand did suffer serious injury as a direct result of the collective acts of the Defendants. By the collective acts of the Defendants, Gelfand was caused to wire monies in foreign commerce, resulting in fraud. The acts of the Defendants caused Gelfand to lose his life's savings resulting in severe hardship to him and to his family.

F.  **The Defendants' Motion to Dismiss should be denied because the Plaintiff is entitled to an opportunity to amend his complaint after a period of discovery, pursuant to *New England Data Servs, Inc. v. Becher*, 829 F. 2d 286 (1st Cir. 1987).**

As alleged in the Plaintiff's complaint and supported by the affidavit of Robert C. Horgan, Esquire, the Plaintiff requested and was denied access to numerous corporate documents. Ex. J, Affidavit of Robert C. Horgan, Esquire. It is asserted in good faith that a period of discovery will reveal the Defendants' complicity in this illegal scheme. Since the Defendants control the flow of information, the Defendants' motion to dismiss should be denied and the Plaintiff should be allowed to proceed with discovery and/or amend his complaint.

## VI. CONCLUSION

As alleged with sufficient specificity, that the Defendants named in this case have committed numerous predicate acts over a substantial period of time. The Defendants' efforts,

through their association with Atlantic, were intended to defraud Gelfand and other plaintiffs in this court.

Wynn, for his part, states on the one hand that Attorney Zyfers was Atlantic's attorney; while at the same time his former attorney Neil Marshall Brown states that Attorney Zyfers was the principal draftsman of the corporate documents and that Wynn was working under the supervision of Attorney John A. Zizza. The conflicting statements of Wynn and Attorney Brown further underscore the deceptive tactics on the part of the Defendants. What is clear, as stated above, is that Wynn, pursuant to Justice Greaney's Order, was not permitted to work as a paralegal for Attorneys Zyfer's or Zizza.

There can be little doubt that the named civil RICO Defendants used Wynn's disguise as corporate counsel to cast a shroud of credibility on the fraudulent scheme. Gelfand in his complaint has clearly demonstrated that the fraudulent scheme has been the proximate cause of his severe economic injuries.

Gelfand and his family have suffered severe economic harm as a direct result of the Defendants' acts. For the forgoing reasons, the Defendant's motion to dismiss should be denied.

Respectfully submitted,
LEON GELFAND, Plaintiff

By his attorney,

_____
Richard F. Ready, Esquire
Law Offices of Richard F. Ready
25 Walnut Street, Suite #300
Wellesley, MA 02481
(781) 239-1088
BBO #561947

Dated: March 22, 2004